NOT DESIGNATED FOR PUBLICATION

No. 114,458

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

HUMBERTO CHAVEZ,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed October 7, 2016. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Ethan Zipf-Sigler*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., GREEN and BUSER, JJ.

*Per Curiam*:  Following a trial by jury, Humberto Chavez was acquitted on a charge of aggravated battery against a police officer, but he was convicted of aggravated battery against another officer. A posttrial motion for a new trial was denied, Chavez was sentenced to 107 months in prison and to 36 months of postrelease supervision. On direct appeal, Chavez' principal arguments are as follows: First, he contends that his trial attorney provided ineffective assistance of counsel; thus, the trial court erred when it denied his new trial motion alleging ineffective assistance of counsel. Second, Chavez argues that there was insufficient evidence to support his conviction. Third, Chavez

1

argues that the trial court erred in instructing the jury on the elements of aggravated battery against a law enforcement officer. Nevertheless, we find no reversible error. Accordingly, we affirm.

On September 22, 2012, around 3:30 a.m., Captain Thomas Joyce was driving his patrol car when he saw a man on the porch of 913 Argentine Boulevard, in Kansas City, Kansas. Captain Joyce took notice of the man because the man was near a house that had been recently involved in a homicide. There was a dark colored car in the driveway of the house. Captain Joyce continued driving, but when he reached the 1200 block of Argentine Boulevard, he heard a call over the police radio that someone had reported a suspicious person standing on the porch of 913 Argentine Boulevard. Captain Joyce turned his patrol car around and drove back to that address.

When Captain Joyce drove up, the man he had seen earlier on the porch and the car which had been in the driveway were no longer there. Another man walked towards Captain Joyce, pointed across the street, and said, "There he is." Captain Joyce turned around and saw the dark colored car that had been in the driveway of 913 Argentine Boulevard. The car was now parked by the curb across the street in front of 918 Argentine Boulevard. Captain Joyce also saw that a man was on the porch of 918 Argentine Boulevard. Captain Joyce noticed that the man appeared to be Hispanic, about 6 feet tall, and was wearing a plaid shirt. When Captain Joyce approached the man, the man jumped off the porch and started running. Captain Joyce let the dispatcher know that he was pursuing a suspicious 6-foot tall Hispanic male wearing a plaid shirt, who was fleeing from him after jumping off the porch at 918 Argentine Boulevard.

After a short time, Officer Terry Grimes and Officer Keith Falkner joined the chase. The officers were in "a cat and mouse chase" with the suspect. The police officers would create a perimeter around the area, catch a glimpse of the suspect, and then lose sight of him. At one point, Officer Grimes saw the suspect running across nearby 10th

2

Street. Eventually, Captain Joyce left the area and drove back to the police station. Officer Grimes and Officer Falkner remained and positioned themselves in an abandoned lot across the street from 918 Argentine Boulevard, about 35 to 45 yards from the dark colored car that was still parked by the curb. Officer Grimes and Officer Falkner believed the suspect would eventually return to the dark colored car: a black Ford Focus. Another officer, Officer Charles Stanturf, positioned himself about two blocks down the street from 918 Argentine Boulevard.

About an hour later, at 5:30 a.m., Officer Grimes and Officer Falkner saw the suspect walk across the porch of 916 Argentine Boulevard and onto the porch of 918 Argentine Boulevard. The man knocked on the door of 918 Argentine, but nobody answered. Then, the man picked up a red cooler sitting on the porch of 918 Argentine Boulevard and headed down to the Ford Focus parked by the curb.

As the man, later identified as Chavez, walked towards the dark colored car with the cooler, Officer Grimes and Officer Falkner began running across the abandoned lot. At trial, Officer Grimes and Officer Falkner both testified that Chavez accelerated his pace once he saw them running across the street towards him.

Chavez was able to get into the driver's side of the car and shut the door before Officer Grimes and Officer Falkner crossed the street. Officer Falkner reached Chavez' car first and opened Chavez' driver's side door. Officer Falkner stood between Chavez' open driver's side door and Chavez, who was sitting in the driver's seat. Officer Grimes stood at an angle behind Officer Falkner. When Officer Falkner opened Chavez' driver's side door, he used his right hand to point his taser at Chavez while telling Chavez to "[g]et out of the car." According to Officer Falkner, Chavez instantly responded, "Why?" Immediately, Chavez pressed down on his car's accelerator, driving in reverse.

3

Because of Officer Falkner's position between Chavez' open driver's side door and the body of the car, the driver's side door knocked Officer Falkner onto the ground. Moreover, Officer Falkner's left leg somehow became pinned under the driver's side door. As Chavez drove away in reverse, he dragged Officer Falkner along the road. Officer Falkner was able to hold onto Chavez' open driver's side door with his left hand; this allowed Officer Falkner hold his head off of the pavement. At some point, Officer Falkner dropped his taser. According to Officer Grimes, who had been hit in the elbow when Chavez reversed the car, he believed the car reached a speed of about 35 miles per hour in reverse. According to Officer Falkner, as Chavez was dragging him along the road, he begged "[Chavez] to stop."

When Chavez did not stop, Officer Falkner used his right hand to grab his handgun. Officer Falkner fired three shots at Chavez. This caused Chavez to make a violent steering maneuver, freeing Falkner's left leg and unpinning him from underneath Chavez' driver's side door. Chavez had dragged Officer Faulkner an estimated 100 to 150 feet before freeing the officer's leg.

Still moving in reverse, Chavez crashed his car into two parked cars further down the street. Officer Grimes and Officer Stanturf pulled the wounded Chavez out of his car and arrested him. Chavez, a 6-foot tall Hispanic male, was wearing a plaid shirt.

Officer Grimes, Officer Falkner, and Chavez were all sent to the University of Kansas Medical Center (KU Med Center). Officer Grimes suffered a bruise, an abrasion, and radiating pain on his elbow. Officer Falkner suffered both bruises and abrasions over his arms, legs, and hands. Moreover, his uniform and belt had been shredded by the pavement. Chavez suffered three bullet wounds to the lower half of his body.

The State initially charged Chavez with one count of aggravated battery against a law enforcement officer in violation of K.S.A. 2015 Supp. 21-5413(d). The single count

4

listed both Officer Grimes and Officer Falkner as victims. Moreover, the information stated that the crime was a severity level 6 person felony, even though under K.S.A. 2015 Supp. 21-5413(d), an aggravated battery against a law enforcement officer is either a level 3 or a level 4 person felony. See K.S.A. 2015 Supp. 21-5413(g)(4)(A)-(B). On December 4, 2012, the State filed its first amended information, charging Chavez with one count of aggravated battery against a law enforcement officer for Officer Grime's injury and one count of aggravated battery against a law enforcement officer for Officer Falkner's injuries. Each count stated that an aggravated battery against a law enforcement officer in violation of K.S.A. 2015 Supp. 21-5413(d) constituted a level 6 person felony.

On April 18, 2013, Chavez' preliminary hearing was held. Following the testimony of Officer Grimes, Officer Falkner, and Officer Stanturf, the trial court bound Chavez over on both counts of aggravated battery against a law enforcement officer.

On June 17, 2013, the State filed a second amended information. The State still charged Chavez with two counts of aggravated battery against a law enforcement officer, one count each for the alleged aggravated batteries of Officer Grimes and Officer Falkner, respectively. This time, however, the counts stated that Chavez had committed an aggravated battery against a law enforcement officer in violation of K.S.A. 2015 Supp. 21-5413(d)(3)(A), which is a severity level 3 person felony. K.S.A. 2015 Supp. 21-5413(d)(3)(A) states that the aggravated battery against a law enforcement officer is "knowingly causing, with a motor vehicle, bodily harm to a . . . [u]niformed or properly identified state, county or city law enforcement officer while the officer is engaged in the performance of the officer's duty."

On October 7 and 8, 2013, Chavez' jury trial was held. At his trial, Chavez was represented by Craig Lubow. Chavez' theory at trial was that he had been at his friend's house located at 918 Argentine Boulevard the morning of September 22, 2012; thus, he was not the suspect the police were chasing around the Argentine Boulevard area that

5

morning. Moreover, Chavez asserted that Officer Falkner tased him, which resulted in him losing muscle control and unintentionally driving off in reverse.

To counter this theory, the State presented the testimony of Captain Joyce, Officer Grimes, Officer Falkner, and Officer Stanturf. Each police officer testified about their role in searching for the suspect and final confrontation with Chavez. Each police officer testified that they were wearing their police uniforms while driving in their patrol cars that morning. Captain Joyce and Officer Grimes, who both saw the suspect running away from them that morning, testified that they knew Chavez was the suspect. Captain Joyce explained that he got a pretty good view of the suspect when he ran under a streetlight. Captain Joyce explained that when he returned to the scene after Chavez' arrest he knew Chavez was the suspect because he was wearing the same clothes. Officer Grimes explained that he knew Chavez was the suspect because Chavez was wearing the same clothes as the suspect he saw running across 10th Street earlier that morning. Officer Grimes explained he was sure of this because Chavez' car was parked under a streetlight, so he had a good view of Chavez before he and Officer Falkner approached him from across the abandoned lot.

Both Officer Grimes and Officer Falkner testified that as they were running towards Chavez, he "hastened" his movements and looked at them. Officer Grimes testified that he yelled, "Police, police" after Chavez had already shut his car door, while Officer Falkner testified that he yelled, "Stop, police" while Chavez was still outside the car. According to their testimony, neither Office Grimes nor Officer Falkner were aware that Chavez had started his car or shifted it into reverse when they approached.

Officer Falkner testified about how his taser worked, explaining that the taser shoots out two prongs, both of which must attach to the other person to create an electrical current. Officer Falkner explained that he had his taser in his right hand pointed at Chavez when he opened the door and asked Chavez to get out of the car. Officer

6

Falkner explained that Chavez immediately looked at him and asked, "Why?" Officer Falkner testified that he was surprised the taser fired because he never intended to shoot Chavez with the taser, but he theorized that his taser must have discharged when he dropped it onto the pavement as Chavez dragged him down the road. Officer Falkner specifically testified that the taser could not have discharged until after Chavez accelerated in reverse, knocking him to the ground.

Both Officer Grimes and Officer Falkner testified about how they obtained their injuries. Their respective nurses from the KU Med Center testified about the extent of the officers injuries. Photos of their injuries were also admitted into evidence.

Chavez testified on his own behalf, explaining that he had spent the evening with his friend, Victor Prado, before driving his car over to R. Ramirez' house at 918 Argentine Boulevard. Chavez testified that he was with Ramirez, as well as other unnamed persons staying at Ramirez' house, when Captain Joyce, Officer Grimes, and Officer Falkner were chasing the suspect. Chavez explained that when he picked up his cooler on Ramirez' porch and walked down to his car, he did not see anyone running towards him and did not hear anyone yelling "stop" or "police." Chavez alleged that after he got into his car, Officer Falkner opened his door and tased him immediately. Chavez alleged that Officer Falkner never told him to get out of the car. Chavez contended that the taser hit him in the chest, causing him to clinch the steering wheel while pushing down on his car's accelerator. Chavez contended that he could not remember anything after the taser hit him in the chest. Chavez further contended that he never meant to hurt Officer Grimes or Officer Falkner.

No other witnesses testified on behalf of Chavez. Nevertheless, the State and Chavez stipulated to the fact that the two prongs of Officer Falkner's taser were found inside Chavez' car. A picture of the prongs in Chavez' car was admitted into evidence.

7

The jury found Chavez not guilty of committing an aggravated battery against Officer Grimes but guilty of committing an aggravated battery against Officer Falkner.

Before Chavez' sentencing, Lubow moved for a new trial. In the new trial motion, Lubow argued that Chavez was entitled to a new trial, in part, because he had incorrect information about the identity of Chavez' doctor at the KU Med Center, which resulted in no medical testimony about the possibility of Chavez being tased. Lubow moved to withdraw as counsel. In this motion, Lubow explained that Chavez "expressed a desire to remove [him] as his counsel in this matter because of his dissatisfaction with the outcome of the trial."

The trial court allowed Lubow to withdraw and appointed Joseph Rockey to represent Chavez. In August 2014, 6 months after appointing Rockey, Chavez filed a pro se motion to remove Rockey as his counsel because they did not get along and Rockey had not worked hard enough on his case. At the same time, Chavez filed a pro se "motion to compel exculpatory evidence," which essentially complained about Lubow's representation of him during trial. Specifically, Chavez alleged that Lubow failed to provide him with certain exculpatory evidence.

The trial court granted Chavez' request, which allowed Rockey to withdraw as his counsel and then appointed Michael Nichols to represent Chavez. It seems that Nichols did not file any additional new trial motions.

On February 27, 2015, the trial court was scheduled to hear Chavez' motion for new trial. At the outset of the hearing, however, Nichols told the court that Chavez wanted him to withdrawal as counsel. The trial court asked Chavez why he was unhappy with Nichols. Chavez responded that Nichols was untrustworthy, unreliable, and lying to him about transcripts. Chavez further asserted that Nichols had lied to him because

8

Nichols had promised to visit him in jail when he spoke to him on the phone on September 29, but Nichols did not actually visit him until 2 days later on October 1.

Nichols told the trial court that he gave Chavez the entirety of his trial transcript but he had accidently copied it without the bottom four lines of page 84. Nichols also told the trial court that he believed Chavez was mad at him because he subpoenaed Lubow for the new trial motion and Chavez did not want Lubow to testify.

The trial court explained to Chavez that his problems with Nichols were not legitimate reasons to require Nichols to withdraw. The trial court pointed out that this was Chavez' fourth attorney and that it believed that Chavez would have problems with anyone appointed. Accordingly, the trial court denied Chavez' request that Nichols withdraw.

After the trial court told Chavez that his motion was denied, Chavez continued to fight with the trial court, stating that Nichols had lied to the court. The trial court told Chavez that it had already ruled and that Chavez needed to be quiet unless asked to speak. Chavez then interrupted the trial court, stating, "He's not my attorney anymore. I fired him." The trial court told Chavez that his new trial motion was important, so he needed to be quiet and follow the court's rules or else risk being held in contempt. Chavez responded, "I would like to leave this place because he is fired." The trial court explained that Nichols was still his attorney because it had denied Chavez' motion for lack of legitimate fact or legal reasons to grant the withdrawal. Chavez responded, "I would like to say that . . . I'm not gonna agree to be in a place where I'm telling you that he's not my attorney no more and you still proceeding with this." The trial court told Chavez his new trial motion "involve[d] consequences to [his] life that [were] important and [he] should [therefore] be a part of [the hearing]." Chavez responded, "He's no longer my attorney, so I will not stay." Accordingly, Chavez was removed from the courtroom.

9

The hearing then continued without Chavez. Nichols argued that Chavez was entitled to a new trial because Lubow provided ineffective assistance of trial counsel. Specifically, Nichols argued: (1) that Lubow erred by failing to challenge the State's second amended information, which amended Chavez' aggravated battery against a law enforcement officer charges from level 6 person felonies to level 3 person felonies; (2) that Lubow erred by failing to file a motion to suppress evidence because the police did not have reasonable suspicion to approach Chavez as he entered his car; (3) that Lubow erred by failing to make reasonable efforts to locate Ramirez and Prado; (4) that Lubow erred by failing to conduct more research on tasers and failing to call a taser expert as a witness at trial; (5) that Lubow erred by failing to call Chavez' medical doctors to discuss whether Chavez was tased; and (6) that Lubow erred by failing to request a continuance when the person, who Lubow initially believed was Chavez' doctor, failed to show up at trial.

Nichols called Lubow to testify about his performance as Chavez' trial attorney. Lubow explained that he did not believe he needed to challenge the State's second amended information changing the severity level from a 6 to a 3 because Chavez was still being charged with two counts of aggravated battery against a law enforcement officer under K.S.A. 2015 Supp. 21-5413(d). Lubow testified that he thought he had challenged whether the police had reasonable suspicion to stop Chavez. Lubow testified that he did not research tasers but thought that enough information about tasers would come into evidence through the police officers' testimony and Chavez' doctor's testimony.

Lubow explained that he had subpoenaed many doctors from the KU Med Center to testify at trial. Lubow explained that Amy Zukel, who works at the KU Med Center, had called him and told him that not all of the doctors could testify because it would close down the emergency room. According to Lubow, Zukel told him that she would find the specific doctor who had treated Chavez so that doctor would be available to testify. Lubow asserted that about 2 or 3 days before trial, Zukel gave him the name of a doctor

10

who supposedly treated Chavez, but the doctor never showed up. During the lunch break on the second day of trial, Lubow called the doctor to come and testify after lunch. Lubow asserted that the doctor's assistant told him that the doctor had not actually treated Chavez but merely written one of his medical reports. Lubow then explained that he never considered asking for a continuance at that time, but Lubow had considered requesting a continuance the week prior because he learned that Ramirez and Prado would not testify. Lubow testified that when he told Chavez that he was considering asking for a continuance, Chavez demanded that his trial proceed as planned.

Lubow further testified that he had obtained Chavez' medical records. Lubow testified that the records did not indicate that Chavez had been tased.

Regarding Ramirez, Lubow explained that Chavez' family had not been forthcoming with information necessary to contact Ramirez. Lubow testified that although he asked multiple people, nobody gave him Ramirez' contact information; thus, she was never served with a subpoena. Regarding Prado, Lubow testified that he met with Prado once. During that meeting, Prado gave him his phone number. Nevertheless, according to Lubow, when he called that phone number and left messages, Prado never responded. Lubow explained that he had learned that Prado had outstanding warrants for his arrest, which made him doubt that Prado would show up to testify even though he had been subpoenaed. Lubow reiterated that he had told Chavez a week before trial that he believed a continuance would be the best option because neither Ramirez nor Prado would be available, but Chavez adamantly argued that he wanted to proceed with the trial.

The trial court denied Chavez' motion for a new trial because (1) Lubow did not need to challenge the second amended information since Chavez' charges remained the same; (2) Lubow did not need to move to suppress any evidence because reasonable suspicion to stop Chavez existed; (3) Lubow did not err by failing to have Ramirez or

11

Prado testify given that neither witnessed the aggravated battery of Officer Falkner; (4) Lubow did enough to present evidence on tasers because Chavez testified that he had been tased and there was a stipulation that the taser prongs were in the car; and (5) Lubow did not err by failing to follow up with the doctor given that no evidence existed in Chavez' medical records that he had actually been tased and Chavez' taser theory had been presented to the jury in its entirety.

After denying the new trial motion, the trial court told Nichols to retrieve Chavez for sentencing. Upon Nichols' return from Chavez' jail cell, however, Nichols told the court that Chavez had refused to return for sentencing. Nichols explained that Chavez was still saying that he had fired him and was very angry with him for arguing the new trial motion without his consent. As a result, the trial court "proceed[ed] with sentencing in absentia."

Nichols moved for a downward durational departure because Officer Falkner suffered only minor injuries and because Chavez had been shot three times. The State requested that the trial court impose the aggravated sentence because although Officer Falkner suffered only road-rash, he could have been badly hurt or killed. The trial court granted the State's request, sentencing Chavez to the aggravated sentence of 107 months' imprisonment followed by 36 months' postrelease supervision.

*Did the Trial Court Err by Denying Chavez' Motion For New Trial?*

Chavez argues that the trial court erred when it denied his motion for new trial alleging ineffective assistance of counsel for four reasons. Specifically, Chavez asserts that Lubow's representation was unreasonable under the Sixth Amendment to the United States Constitution because (1) Lubow never challenged the State's second amended information, amending the severity level of his aggravated battery against Officer Falkner from a severity level 6 to a severity level 3 person felony; (2) Lubow never filed a motion

12

to suppress evidence challenging whether the police had reasonable suspicion to stop him; (3) Lubow failed to present testimony from Ramirez and Prado; and (4) Lubow failed to do enough to obtain and present information to support Chavez' taser defense theory.

The State responds that Lubow did not provide ineffective assistance of counsel during Chavez' trial. The State further responds that even if Lubow provided ineffective assistance of counsel, Chavez has failed to establish prejudice.

*Standard of Review*

An appellate court reviews a trial court's denial of a motion for new trial for an abuse of discretion. *State v. Schumacher*, 298 Kan. 1059, 1069, 322 P.3d 1016 (2014). An abuse of discretion occurs if a judicial action is (1) arbitrary, fanciful, or unreasonable; (2) based on error of law; or (3) based on error of fact. *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014).

Claims alleging ineffective assistance of counsel contain mixed questions of fact and law. *State v. Bowen*, 299 Kan. 339, 343, 323 P.3d 853 (2014). As a result, this court reviews a trial court's factual findings to determine if they are supported by substantial competent evidence and legal conclusions de novo. *Bowen*, 299 Kan. at 343.

Defendants establish that counsel was ineffective if (1) counsel's performance was constitutionally deficient; and (2) counsel's constitutionally deficient performance resulted in prejudice. *Miller v. State*, 298 Kan. 921, 929, 318 P.3d 155 (2014). Prejudice, under the second prong of this test, exists only if defendants establish that there was a reasonable probability that the outcome of their trials would have been different but for the deficient performance. *Miller*, 298 Kan. at 934. In conducting this review, appellate

13

courts must strongly presume that counsel's conduct fell within a range of reasonableness. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014).

Counsel is in control of making tactical and strategic decisions. *Shumway v. State*, 48 Kan. App. 2d 490, 497, 293 P.3d 772 (2013). Counsel's strategic decisions made after a comprehensive investigation are virtually unchallengeable. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]). Moreover, even when counsel makes strategic decisions after a less than comprehensive investigation, counsel's decisions will be deemed reasonable to the extent that reasonable professional judgment supports the decision under the circumstances of the case. *Cheatham*, 296 Kan. at 437.

*Failure to Challenge Amended Information*

Before the preliminary hearing the State filed its first amended information, charging Chavez with two counts of aggravated battery against a law enforcement officer in violation of "K.S.A. 21-5413(d)." (Emphasis added.) The first amended information stated that Chavez' charges were level 6 person felonies. Moreover, both counts simply stated that "Chavez did unlawfully, and knowingly cause *bodily harm* to the person of another . . ." (Emphasis added.) On June 17, 2013, about 1 month after Chavez' preliminary hearing, the State filed its second amended information, charging Chavez with two counts of aggravated battery against a law enforcement officer under K.S.A. 2015 Supp. 21-5413(d)(3)(A), each severity level 3 person felonies. The second amended information alleged that Chavez committed aggravated battery under K.S.A. 2015 Supp. 21-5413(d)(3)(A) by "unlawfully, and knowingly caus[ing], with a motor vehicle, *bodily harm*" to Officer Grimes and Officer Falkner. (Emphasis added.) Chavez' trial was held 3 1/2 months later on October 7 and 8, 2013.

14

K.S.A. 2015 Supp. 21-5413(d) has three subsections—(d)(1), (d)(2), and (d)(3). K.S.A. 2015 Supp. 21-5413(d)(1)(A)-(E) states that defendants commit aggravated batteries under this subsection by knowingly causing great bodily harm or disfigurement to a law enforcement officer, judge, attorney, or community corrections officer. Violations of this subsection are severity level 3 person felonies. See K.S.A. 2015 Supp. 21-5413(g)(4)(A). K.S.A. 2015 Supp. 21-5413(d)(2)(A)-(E) states that defendants commit aggravated batteries under this subsection by "knowingly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted" or "knowingly causing physical contact with another person when done in a rude, insulting or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted" to a law enforcement officer, judge, attorney, or community corrections officer. Violations of this subsection are severity level 4 person felonies. See K.S.A. 2015 Supp. 21-5413(g)(4)(B).

K.S.A. 2015 Supp. 21-5413(d)(3)(A), the subsection Chavez was finally charged under, states that defendants commit aggravated batteries under this subsection by "knowingly causing, with a motor vehicle, bodily harm to a: Uniformed or properly identified state, county or city law enforcement officer while the officer is engaged in the performance of the officer's duty." This is a severity level 3 person felony. See K.S.A. 2015 Supp. 21-5413(g)(4)(A). Subsection (B) of K.S.A. 2015 Supp. 21-5413(d)(3) states that defendants commit aggravated batteries under this subsection by "knowingly causing, with a motor vehicle, bodily harm to a: uniformed or properly identified university or campus police officer while such officer is engaged in the performance of such officer's duty." This is also a severity level 3 person felony. See K.S.A. 2015 Supp. 21-5413(g)(4)(A).

On appeal, Chavez asserts that Lubow should have challenged the State's second amended information charging him with severity level 3, instead of severity level 6,

15

person felonies. Chavez asserts the second amended information resulted in him being charged with two new crimes. According to Chavez, because he was charged with new crimes, he was entitled to a new preliminary hearing. In support of this argument, Chavez asserts that the State must have originally charged him under K.S.A. 2015 Supp. 21-5413(d)(2)(A), which is a severity level 4 person felony, because the first amended information filed before the preliminary hearing alleged "bodily harm" as opposed to "great bodily harm." In consequence, Chavez argues that Lubow's failure to challenge the State's second amended information constitutes deficient performance.

When reviewing amendments to an information, appellate courts must consider: "'(1) Does the amendment charge an additional or different crime? [and] (2) Are the substantial rights of the defendant prejudiced by the amendment? [Citations omitted.]'" *State v. Spangler*, 38 Kan. App. 2d 817, 824, 173 P.3d 656 (2007) (quoting *State v. Matson*, 260 Kan. 366, 370, 921 P.2d 790 [1996]). Here, although Chavez contends that he was charged with a new crime, he was not. Instead, the second amended information merely clarified the subsection of K.S.A. 2015 Supp. 21-5413(d) Chavez was being charged under and fixed a clerical error. Moreover, even if Lubow did err, Chavez cannot establish that the error resulted in prejudice.

First, it is readily apparent that Chavez was not charged with new crimes because the State's second amended information charged Chavez with the same crimes. The original and first amendment information broadly stated that Chavez was being charged with committing aggravated batteries against a law enforcement officer under 2015 Supp. K.S.A. 21-5413(d) by causing bodily harm, without specifying which of the three subsections of (d) under which Chavez was being charged. When the State filed the second amended information, Chavez was still charged under K.S.A. 2015 Supp. 21-5413(d) but the State clarified that he was being charged under subsection (3)(A). As a result, Chavez was always charged with committing aggravated batteries against law enforcement officers. If Chavez wanted to know what subsection of K.S.A. 2015 Supp.

16

21-5413(d) he was being charged under, Chavez could have complained earlier, but he did not. In summary, Chavez' argument must fail because he was not charged with a new crime.

Second, although the State amended the severity level of Chavez' crimes in the second amended information, this does not mean that Chavez was being charged with new crimes. In the past, this court has held that "[a] change in the severity level of a crime is relevant only to sentencing and does not constitute an additional or different crime." *State v. Hopson*, No. 93,543, 2006 WL 3056472, at *5 (Kan. App. 2006) (unpublished opinion), *rev. denied* 283 Kan. 932 (2007). Consequently, despite Chavez' assertion to the contrary, the change in severity level did not result in him being charged with two new crimes.

What is more, the State's first amended information stated that Chavez had been charged with severity level 6 person felonies even though no aggravated battery against a law enforcement officer under K.S.A. 2015 Supp. 21-5413(d)(1)-(3) are severity level 6 person felonies. As summarized, an aggravated battery against a law enforcement officer is either a severity level 3 or severity level 4 person felony. When the State filed the second amended information, it merely fixed a clerical mistake. Thus, the State's second amended information simply clarified that Chavez was being charged under K.S.A. 2015 Supp. 21-5413(d)(3)(A), which is a severity level 3 person offense, as opposed to charging him with two new crimes.

Third, Chavez' argument about regarding the "bodily harm" language is flawed. Both subsection (d)(2) and subsection (d)(3) of K.S.A. 2015 Supp. 21-5413 require "bodily harm" as opposed to "great bodily harm." Thus, the fact that the State accused Chavez of committing "bodily harm" in its original and first amended complaint is not proof that it intended to charge him under subsection (d)(2) of K.S.A. 2015 Supp. 21-5413. The "bodily harm" language implies that the State could have been charging

17

Chavez under either subsection (d)(2) or subsection (d)(3) of K.S.A. 2015 Supp. 21-5413, not one or the other. It is also worth observing that neither the original nor the first amended information included language concerning the use of a deadly weapon or any other item that may cause great bodily harm or disfigurement, which are elements of K.S.A. 2015 Supp. 21-5413(d)(2). This fact further undermines Chavez' argument that the State was originally charging him under K.S.A. 2015 Supp. 21-5413(d)(2), a severity level 4 person felony.

Fourth, even if the State had charged Chavez with new crimes, adding support to Chavez' assertion that Lubow should have objected to the second amended information, Chavez cannot establish that he was prejudiced by such an error. Trial courts have discretion to allow amendments to an information any time after arraignment and plea but before the commencement of trial. *State v. Hayden*, 281 Kan. 112, 130, 130 P.3d 24 (2006). Thus, the State can move to amend an information at any point up to the day of trial. In *Hayden*, for example, our Supreme Court held that any error that resulted from the trial court allowing the State to amend the information from charging Hayden with one count of aggravated battery to charging Hayden with one count of aggravated burglary was harmless and not prejudicial. 281 Kan. at 131. The *Hayden* court reached this holding because Hayden had notice that he might be charged with the aggravated burglary well before the beginning of his trial. 281 Kan. at 131.

Here, the State filed the second amended information 1 month after the preliminary hearing and 3 1/2 months before Chavez' trial. Nobody ever disputed that Chavez injured Officer Grimes and Officer Falkner with his car. As the State asserts in its brief, both Officer Grimes and Officer Falkner testified at length at the preliminary hearing about being injured by Chavez' car. Therefore, Chavez had ample time to prepare his trial defense against the two aggravated battery against a law enforcement officer charges under K.S.A. 2015 Supp. 21-5413(d)(3)(A). Moreover, it must be noted that

18

Chavez' trial went relatively well given that he was acquitted of the count of aggravated battery against Officer Grimes.

As a result, even if Lubow erred by failing to challenge the State's second amended information, Chavez cannot establish that the State's second amended information, clarifying that he had been charged with two severity level 3 person felonies under K.S.A. 2015 Supp. 21-5413(d)(3)(A), resulted in any prejudice. Because Chavez cannot establish prejudice, he cannot show that Lubow's failure to challenge the second amended information resulted in reversible error.

*Failure to File a Motion to Suppress Evidence*

Next, Chavez argues that Lubow provided deficient performance by failing to move to suppress evidence based on Officer Grimes' and Officer Falkner's lack of reasonable suspicion to conduct the stop. Chavez emphasizes that no police officer saw him commit a crime. Accordingly, Chavez asserts that a reasonable attorney would have moved to suppress all incriminating evidence stemming from Officer Grimes and Officer's Falkner's stop. In support of this argument, Chavez points out that at the new trial hearing, Lubow testified that he thought he had moved to suppress evidence, when in fact he had not.

Nevertheless, there are multiple problems with Chavez' argument. First, as the State argues in its brief, a lack of reasonable suspicion to conduct a stop does not result in the suppression of evidence stemming from Chavez' later aggravated battery against Officer Falkner. K.S.A. 2015 Supp. 21-5229 states:

> "A person is not authorized to use force to resist an arrest which such person knows is being made either by a law enforcement officer or by a private person

19

> summoned and directed by a law enforcement officer to make the arrest, even if the person arrested believes that the arrest is unlawful."

This provision means that unlawful stops do not give persons the right to batter law enforcement officers. Thus, any battery against a law enforcement officer is a new and separate crime. Moreover, as considered at length below, although Chavez challenges whether he knew that Officer Grimes and Officer Falkner were law enforcement officers, sufficient evidence supported that Chavez knew he was being stopped by law enforcement officers. Hence, nothing regarding Chavez' aggravated battery of Officer Falkner was subject to suppression based on an illegal stop. As a result, Lubow did not err by failing to challenge whether Officer Grimes and Officer Falkner had reasonable suspicion to stop Chavez.

Second, despite Chavez' arguments to the contrary, the police saw Chavez potentially commit trespass and theft. Reasonable suspicion exists when the totality of the circumstances indicate that a suspect has committed, is committing, or is about to commit a crime. *City of Atwood v. Pianalto*, 301 Kan. 1008, 1011, 350 P.3d 1048 (2015) Again, in this case, somebody called the police because Chavez was on the porch of 913 Argentine Boulevard around 3:30 a.m. Clearly, that person believed that Chavez did not belong on this porch. This was evidence supporting that Chavez was trespassing. Moreover, according to Officer Grimes testimony, at around 5:30 a.m., he and Officer Falkner saw Chavez knock on the door of 918 Argentine Boulevard. When nobody answered, Chavez took a red cooler that was sitting on the porch of 918 Argentine Boulevard, walked towards his car, and then put it in his car. This was evidence supporting that Chavez was possibly committing a theft. Additionally, although the fact that a person is out late at night or early in the morning cannot be the sole evidence in support of reasonable suspicion, this evidence can help support that reasonable suspicion exists. See *State v. Bastian*, 37 Kan. App. 2d 156, 161, 150 P.3d 912 (2007) (holding that the officer had reasonable suspicion that suspect was trespassing or about to commit

20

crime when the officer saw defendant slumped over a wheel of a truck parked on private property in the middle of the night). Consequently, based on those facts, Officer Grimes and Officer Falkner had reasonable suspicion to make the stop.

Third, although neither party has raised this exact argument, it is important to recognize that in *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000), the United States Supreme Court held that police officers have reasonable suspicion to conduct a stop when (1) the suspect flees from them; and (2) the suspect flees from them in a high crime area. Here, Captain Joyce and Officer Grimes testified that Chavez was the suspect who fled from them several times during a nearly 2-hour cat and mouse chase. Captain Joyce also testified that he took notice of the suspect, who he later identified as Chavez, because he was standing near a house where a homicide had recently occurred. This indicates that Chavez was in a higher crime area. Accordingly, the fact that Chavez fled from police in a high crime area further supports that Officer Grimes and Officer Falkner had reasonable suspicion to conduct the stop.

In conclusion, Lubow was not required to move to suppress anything because (1) the aggravated battery of Officer Falkner was a new and separate crime unrelated to whether there was reasonable suspicion to stop Chavez; and (2) the officers had reasonable suspicion to stop Chavez. Because Lubow did not err by failing to move to suppress evidence, the trial court properly ruled that Lubow was not ineffective for failing to make such a motion.

*Failure to Present the Testimony of Ramirez and Prado*

Next, Chavez asserts that Lubow did not do enough to contact Ramirez and Prado to ensure that they would both testify. In his brief, Chavez contends that Ramirez' testimony and Prado's testimony would have helped establish that he was not the suspect

running around the Argentine Boulevard neighborhood. Thus, it seems that Chavez argues that Ramirez and Prado were important witnesses to his defense.

Yet again, there are serious problems with Chavez' argument. To begin with, according to Chavez' own trial testimony, neither Ramirez nor Prado saw what occurred when Officer Grimes and Officer Falkner made their stop. In fact, Chavez testified that Prado had left Ramirez' at least 2 hours before the stop occurred. Chavez was convicted of committing an aggravated battery against Officer Falkner, not obstructing a police officer or fleeing and eluding from a police officer. Accordingly, Chavez has admitted that neither Ramirez nor Prado would be able to substantiate anything regarding whether he committed the aggravated battery against Officer Falkner. As a result, while Ramirez' testimony and Prado's testimony might have helped boost Chavez' credibility, Chavez cannot conclusively establish that but for their testimony he would not have been convicted of committing the aggravated battery against Officer Falkner. Thus, the trial court properly rejected this argument.

More importantly, at the motion for new trial hearing, Lubow testified that Chavez and his family were not forthright about information concerning Ramirez and Prado. Lubow testified that a week before trial, when he realized that Ramirez would not be available at Chavez' trial and that Prado was unlikely to show up, he told Chavez that they should request a continuance. Lubow explained that Chavez was adamant about going to trial, telling him not to request a continuance. As the State asserts in its brief, because Chavez refused to participate at his hearing for new trial, none of Lubow's testimony has been contradicted. Accordingly, the only evidence before the trial court and before this court is that Chavez did not care that Ramirez and Prado would not be testifying at his trial. Since Chavez did not care and wanted the trial to occur even though they would not be testifying, Lubow merely followed his client's wishes by going forward with the trial and did not provide ineffective assistance of counsel by making no further efforts to contact Ramirez and Prado.

22

*Failure to Obtain and Present Evidence About Tasers*

Chavez' primary argument on appeal is that Lubow did not do enough to research and present evidence about tasers. Chavez argues that Lubow should have done more to present his taser defense because his theory at trial was that Officer Falkner tased him in the chest, causing him to unintentionally accelerate in reverse and injure Officer Falkner. Chavez' complaints can be broken down as follows: (1) Lubow should have done more to research tasers, including having an expert testify about tasers at trial; (2) Lubow should have had one of Chavez' doctors speak about the possibility that he was hit by a taser and the effect of tasers on the human body; and (3) Lubow should have asked for a continuance when the man he believed was Chavez' doctor did not come to trial. Chavez contends that he has established prejudice because if Lubow had taken the preceding actions, it would have bolstered his case while damaging the State's case.

The State counters that Lubow's actions were reasonable given the circumstances surrounding Chavez' trial. The State emphasizes that Chavez was able to put on his taser defense theory through his own testimony and the stipulation that the taser prongs were found in his car. Moreover, the State points out that Lubow had Chavez' medical records, which did not indicate that Chavez had been tased. Nevertheless, Lubow's actions of failing to communicate with Chavez' doctor or requesting a continuance when he realized Chavez' doctor would not testify were unreasonable.

*Taser Research and Expert*

At the motion for new trial hearing, Lubow testified that he was not a taser expert and did not do any additional research on how tasers function. Lubow also testified that he planned on bringing in evidence on tasers through different police officers' testimony. On appeal, Chavez contends that this was unreasonable because the jury (1) was unable to learn if being tased could result in a loss of muscle control; and (2) was unable to learn

23

how tasers work. Chavez contends that Lubow needed to call a taser expert to properly present his theory to the jury.

At Chavez' trial, Officer Falkner discussed how tasers work. Officer Falkner testified that officers shoot tasers as they would a gun. The only difference is that instead of bullets, two prongs shoot out of the taser. Officer Falkner testified that both prongs must hit a person to complete a circuit, resulting in an electric shock. Officer Falkner explained that once the taser is shot, an electrical current will last for only 5 seconds. Moreover, Officer Falkner testified that even after an officer shoots another person with a taser, the taser does not necessarily disable the other person.

Although Officer Falkner's testimony about tasers may not have been as detailed as an expert's testimony on tasers, the jury was given enough information to have a basic understanding of tasers. The jury also learned that tasers sometimes disable people and that sometimes tasers do not disable people. This court has previously held "[w]hile defense counsel is considered ineffective for failing to call a witness when a witness would present the only defense available, it is not ineffective assistance of counsel to fail to call a witness whose testimony would only have been cumulative in nature." *Lewis v. State*, 33 Kan. App. 2d 634, 653, 111 P.3d 636 (2003) (citing *United States v. Miller*, 643 F.2d 713, 714 [10th Cir. 1981]). Here, because there was evidence about how tasers worked, any additional expert testimony would have been cumulative. As a result, Lubow was not ineffective by failing to conduct additional taser research and call a taser expert.

*Doctor Testimony and Continuance*

Next, Chavez argues that Lubow did not do enough to ensure that a doctor who treated Chavez would be available to testify about tasers. Specifically, Chavez argues that his doctor would have been able to (1) testify about whether Chavez had been tased; and (2) testify about the effect of tasers on the human body. Chavez points out that Lubow

24

never even spoke to his doctors before trial, instead relying on Zukel. Then, Chavez asserts that because the doctor's testimony was so critical, Lubow should have requested a continuance.

First, although Lubow certainly could have taken more steps to find Chavez' doctor, he did make a reasonable effort to find the doctor. Again, it is undisputed that Lubow subpoenaed multiple doctors from the KU Medical Center, only to be told by Zukel that he could not subpoena all the doctors because it would shut down the emergency room. Then, Lubow relied on Zukel's information that she had found the right doctor who would show up to testify at trial. The fact that the doctor was not the right doctor was unfortunate, but it does not rise to the level of an unreasonable action given that Zukel, a KU Medical Center employee, assured Lubow he was the appropriate doctor. Also, it is important to remember that according to Lubow's testimony, this doctor's name was in Chavez' medical records. The fact the doctor's name was in Chavez' medical records in conjunction with Zukel's assurances further supports that Lubow's actions were not outside the bounds of reasonableness.

Nevertheless, it is troubling that before trial Lubow never spoke to the doctor he believed was Chavez' doctor. This meant that Lubow would have had no idea what the doctor would say before putting him on the witness stand. Accordingly, it is possible that the doctor's testimony could have supported Chavez' testimony but it is also possible that the doctor's testimony could have undercut Chavez' testimony; that is, there was a distinct possibility that if the doctor testified at trial, the doctor could have undermined Chavez' entire taser defense by testifying that Chavez had never been tased. Lubow testified that he got the name of the doctor who was supposed to testify about 2 or 3 days before Chavez' trial. This was plenty of time for Lubow to speak with the doctor to ensure that his testimony would help, not harm, Chavez' defense. In summary, the lack of communication between Lubow and the doctor was unreasonable.

25

The State counters by arguing that the doctor's testimony would be cumulative. Yet, this argument is unpersuasive. The State argues that at best, the doctor's testimony would have been cumulative because Chavez was able to testify that he had been hit in the chest with a taser, and the taser disabled him. This argument, however, takes the cumulative evidence rule too far. A doctor's testimony about whether Chavez was tased and the effects of tasers on the human body is different than Chavez' testimony saying that he was tased and disabled. The doctor might have been able to use science to corroborate Chavez' explanation, something Chavez was not able to do through his own testimony. Thus, in actuality, a doctor's testimony about the possibility of Chavez being tased differs greatly from Chavez' testimony that he was tased.

In turn, when Lubow realized that the doctor would not be testifying, he should have requested a continuance. The decision whether to request a continuance involves trial strategy. See *State v. Ward*, 227 Kan. 663, 666, 608 P.2d 1351 (1980); *State v. Bafford*, 255 Kan. 888, 894-95, 879 P.2d 613 (1994); *State v. Bloom*, 273 Kan. 291, 310, 44 P.3d 305 (2002); *State v. Rivera*, 277 Kan. 109, 117, 83 P.3d 169 (2004). In *Rivera*, for instance, our Supreme Court stated that "[s]trategical and tactical decisions like preparation, scheduling, and the type of defense . . . lie with the defense counsel, who is not required to specifically consult with the defendant before filing a motion for a continuance." 227 Kan. at 117. Again, counsel's strategic decisions are virtually unchallengeable. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013). Nonetheless, when counsel makes a strategic decision after a less than complete investigation, this court will uphold that decision if it was reasonable under the circumstances. *Cheatham*, 296 Kan. at 437.

Again, the doctor's testimony might have provided scientific evidence supporting Chavez' taser defense theory. As Chavez asserts in his brief, the doctor's testimony could have strengthened Chavez' case by letting the jury know that he was truthfully testifying about being tased. Given that it was Chavez' word against Captain Joyce's, Officer

26

Grimes', and Officer Falkner's word, it would have been critical to provide medical evidence that Chavez was in fact tased. Thus, when Lubow learned that there would be no medical testimony, he should have at least attempted to ask for a continuance. Under the circumstances of this case, Lubow's decision to not request a continuance was unreasonable.

*Prejudice Not Established*

The problem with all of Chavez' arguments is that nobody knows what Chavez' doctor would have testified. All of Chavez' arguments are hypotheticals based on the assumption that Chavez' doctor would have confirmed his taser defense theory. For instance, in his brief, Chavez argues "[i]f [] Lubow could have found a medical witness *who could say there was evidence that Chavez had been struck by a taser*, there was a real and reasonable probability that the result of the trial would have been different." (Emphasis added.)

To successfully establish that counsel's actions were so deficient as to require a new trial, defendants must establish that the outcome of their trial would have been different but for counsel's deficient performance. *Miller*, 298 Kan. at 934. This requires proof beyond speculation that the trial would have been different based on something someone might have testified. See *Mullins v. State*, 30 Kan. App. 2d 711, 719, 46 P.3d 1222 (2002) (holding that the court could not find prejudice when "defendant's argument was founded on sheer speculation"). Here, Chavez' argument amounts to sheer speculation because nobody knows what his doctor would have testified. Chavez could have attempted to find his doctor and have him testify at the new trial hearing, but he did not. Accordingly, we are left guessing as to what the doctor would have testified.

Moreover, Officer Falkner testified that his taser could not have gone off until after Chavez knocked him down while speeding off in reverse. Officer Falkner's

testimony indicates that even if Chavez was tased, he was tased after he made the decision to drive off in reverse, which is the action that caused the aggravated battery of Officer Falkner. This means that even if the doctor testified (1) that Chavez had been tased and (2) that tasers can result in loss of muscle control, the doctor's testimony would not rebut Officer Falkner's testimony that Chavez had already battered him with the car before the taser discharged. Because Officer Falkner's testimony indicates that Chavez completed the aggravated battery before he was tased, we cannot say that but for Lubow's failure to have Chavez' doctor testify there was a reasonable probability that the outcome of Chavez' trial would have been different.

Finally, Chavez cannot establish prejudice because the weight of the evidence supports his guilt. Although he was the only person who testified on his behalf, Chavez was able to tell the jury about his version of events, that is, he was not the suspect and he only hurt Officer Falkner because he had been tased. Nevertheless, Captain Joyce and Officer Grimes testified about chasing a man, who they identified as Chavez, around the Argentine Boulevard area for 2 hours. Officer Grimes testified that he could tell the man who picked up the cooler from the porch of 918 Argentine Boulevard was Chavez because he was the same 6-foot tall Hispanic male wearing a plaid shirt he had seen running from him earlier that morning. Officer Falkner testified that Chavez looked right at him and asked him why he needed to get out of the car before he accelerated in reverse. Officer Falkner further testified that his taser could not have gone off until after Chavez pressed down on the accelerator. Officer Falkner also testified about how he became pinned under Chavez' driver's side door and begged Chavez to stop driving, but Chavez continued to drive in reverse until Falkner shot him three times.

Thus, three different officers' testimony developed that Chavez' version of events was false. Three different officers' testimony supported that Chavez knowingly committed an aggravated battery against Officer Falkner with his car. Accordingly, Chavez cannot establish prejudice because even if evidence from Chavez' doctor was

28

presented at trial, other evidence supported that Chavez purposefully committed an aggravated battery against Officer Falkner under K.S.A. 2015 Supp. 21-5413(d)(3)(A).

*Conclusion*

In conclusion, Chavez argues that Lubow provided ineffective assistance of counsel by failing to challenge the State's second amended complaint, by failing to file a motion to suppress evidence, by failing to present the testimony of Ramirez and Prado, and by failing to take certain steps to present more evidence about tasers. Nevertheless, except for Chavez' arguments regarding Lubow's failures in presenting taser evidence from his doctor, each of Chavez' arguments are unpersuasive. Moreover, even though Lubow failed to take reasonable steps to ensure that Chavez' doctor testified, Chavez cannot establish that Lubow's actions resulted in prejudice. Accordingly, the trial court did not err by denying Chavez' new trial motion based on ineffective assistance of counsel.

*Was There Sufficient Evidence to Support Chavez' Conviction?*

Next, Chavez argues that there was insufficient evidence to support his conviction of aggravated battery against a law enforcement officer. Chavez' only argument is that there was insufficient evidence because Officer Falkner's testimony was not credible. Chavez asserts that Officer Falkner's testimony that Chavez "did not have time to lock [his driver's side door]" establishes that there was insufficient evidence to support his conviction because (1) there was no evidence that he tried to lock the door; and (2) there would have been time to lock the door since he was capable of starting his car and putting it in reverse. Then, Chavez contends that this court can conclude (1) that Officer Grimes and Officer Falkner were further away from his car than they testified because he had time to start his car and put in in reverse; and (2) that he had no idea that Officer Grimes

29

and Officer Falkner were police officers because Officer Grimes and Officer Falkner were further away from his car than they testified.

The State responds by asserting that Chavez' arguments regarding Officer Falkner's testimony on Chavez' ability to lock the car door are irrelevant. Moreover, the State points out that even if his argument has merit, Chavez has attacked Officer Falkner's credibility, and credibility determinations are the province of the jury.

*Standard of Review*

Appellate courts reviews a defendant's sufficiency of the evidence challenge in the light most favorable to the prosecution. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014). So long as this court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt, the conviction will not be disturbed. *Williams*, 299 Kan. at 525.

*Analysis*

First, whether Chavez was able to lock his car door is totally irrelevant to whether sufficient evidence supported his conviction. Chavez was convicted of aggravated battery against a law enforcement officer. An aggravated battery against a law enforcement officer under K.S.A. 2015 Supp. 21-5413(d)(3)(A) occurs when a person knowingly causes bodily harm with "a motor vehicle" to a "[u]niformed or properly identified state, county or city law enforcement officer while the officer is engaged in the performance of the officer's duty." Thus, Officer Falkner's testimony about locking the car door does nothing to either prove or disprove that Chavez committed the crime. Instead, any inconsistency in Officer Falkner's testimony would speak to his credibility.

30

Nevertheless, as the State argues, this court cannot reweigh the jury's determination that Officer Falkner's testimony was credible. In short, because the jury convicted Chavez of the aggravated battery of Officer Falkner, the jury obviously made a credibility determination that Officer Falkner's testimony was believable. Kansas courts have consistently held that while reviewing the sufficiency of the evidence to support a conviction, appellate courts must refrain from reweighing evidence or the credibility of witnesses. *Williams*, 299 Kan. at 525. Appellate courts will disregard the factfinder's credibility determination only if the testimony at issue was so incredible that no reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

Here, nothing about Officer Falkner's testimony is inconsistent. A person may have time to start a car and shift gears without having time to lock the door. Or, as Chavez himself argues, he may have never attempted to lock the door. Either way, Officer Falkner simply testified that Chavez "did not have time to lock [his driver's side door]." As a result, it is unclear how the fact Officer Falkner testified that Chavez did not have time to lock the door undermines his credibility. This is especially true given that Chavez admits that he did not lock the door. In summary, even if Chavez' argument about Officer Falkner's testimony on his ability to lock his driver's side door was relevant, we must accept the jury's credibility determination because Officer Falkner's testimony was not unreasonable.

Moreover, the conclusions Chavez jumps to are flawed. Again, Chavez argues that Officer Falkner's testimony that he did not have time to lock his driver's side door was false because he had time to start his car and put it in reverse. Then, Chavez argues (1) that Officer Grimes and Officer Falkner were further away from his car than they maintained they were because otherwise he would not have had time to start his car and put it in reverse; and (2) that Officer Grimes and Officer Falkner were further away from

31

his car than they contended they were because otherwise he would have realized that he was being pursued by law enforcement.

In essence, Chavez has based his arguments on the logical fallacy of denying the antecedent and affirming the consequent. His first argument can be broken down as follows:

A. If a person does not have time to start his car and it put it in reverse, then the police must be near that person's car.
B. But the person had time to start his or her car and put it in reverse.
C. Therefore, the police were far away from the person's car.

Chavez' second argument can be broken down as follows:

A. If the police are far away from a person's car, then that person will not know when the police are approaching his or her car.
B. The person did not know that the police were approaching his or her car.
C. Therefore, the police were far away from the person's car.

Regarding his first argument, Chavez commits the fallacy of denying the antecedent. There may be more than one explanation why Chavez had time to start his car and put it in reverse other than Officer Grimes and Officer Falkner being further away from his car than they testified. For example, both Officer Grimes and Officer Falkner testified that they saw Chavez start moving faster once he realized that they were approaching him. Thus, Chavez' hasty movements might be the reason that he was able to start his car and put it into reverse. In summary, the fact that Chavez had time to start his car and put it in reverse does not warrant the sole condition that the police must have been far away from his car.

32

Regarding his second argument, Chavez commits the fallacy of affirming the consequent. There may be other reasons why people might not realize that police officers are approaching their car. It does not follow that the police had to have been far away from Chavez' car simply because he did not realize they were approaching his car. For one thing, Chavez may not have been looking in the direction from which the police were approaching. Not to mention, Chavez' second argument assumes that he is telling the truth about not knowing that he was being pursued by the police, which is called into question based on Officer Grimes' and Officer Falkner's trial testimony.

As a result, Chavez' sole argument regarding why there was insufficient evidence to convict him fails.

*Was The Jury Improperly Instructed on the Elements of Aggravated Battery Against a Law Enforcment Officer?*

Finally, Chavez argues that his conviction must be reversed because the jury was not properly instructed on the elements of aggravated battery against a law enforcement officer under K.S.A. 2015 Supp. 21-5413(d)(3)(A). Chavez argues that the instruction did not explicitly state that an element of the crime is that he knew or should have known that Officer Falkner was a law enforcement officer. Chavez recognizes that the trial court used the pattern jury instruction (PIK) jury instruction on aggravated battery against a law enforcement officer. See PIK Crim. 4th 54.330. Nevertheless, Chavez argues that his instruction was improper by comparing his crime to the crime of interference with a law enforcement officer under K.S.A. 2015 Supp. 21-5904. The corresponding PIK instruction on interference with a law enforcement officer requires that defendants know or should have known that they were interfering with a law enforcement officer. Then, Chavez continues by asserting (1) that there was sufficient evidence to support his version of the instruction; and (2) that the error resulting from not giving his version of the instruction was not harmless.

The State counters that there can be no error because the trial court gave the jury the PIK instruction for aggravated battery against a law enforcement officer. The State also argues that Chavez' comparison of the aggravated battery against a law enforcement officer under K.S.A. 2015 Supp. 21-5413(d)(3)(A) to the interference with a law enforcement officer under K.S.A. 2015 Supp. 21-5904 is flawed because the interference with a law enforcement PIK instruction has no bearing on the aggravated battery against a law enforcement officer PIK instruction.

*Standard of Review*

Our Supreme Court has outlined an appellate court's standard of review for jury instruction challenges as follows:

"'For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).' [Citation omitted.]" *State v. Smyser*, 297 Kan. 199, 203-04, 299 P.3d 309 (2013).

Chavez, however, did not object to the jury instruction below. When defendants challenge a jury instruction for the first time on appeal, an appellate court will not find error unless the instruction was clearly erroneous. *Smyser*, 297 Kan. at 204. To determine if an instruction was clearly erroneous, this court uses unlimited review while engaging in

34

a two-step process: (1) This court must determine if there was any error based on whether the instruction was legally and factually appropriate; and (2) then, if error exists, this court must determine whether it is firmly convinced a jury would have reached a different verdict but for the error. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

*Applicable Law*

To review, K.S.A. 2015 Supp. 21-5413(d)(3)(A) states that the aggravated battery against a law enforcement officer occurs when a defendant "knowingly caus[es], with a motor vehicle, bodily harm to a: Uniformed or properly identified state, county or city law enforcement officer while the officer is engaged in the performance of the officer's duty." The instruction at issue, based on PIK Crim. 4th 54.330, states:

"The defendant is charged in Count II with Aggravated Battery against a Law Enforcement Officer. The defendant pleads not guilty.

"To establish this charge, each of the following must be proved:

"1. The defendant knowingly caused bodily harm to Officer Keith Falkner with a motor vehible.

"2. Officer Keith Falkner was a uniformed or properly identified city law enforcment officer.

"3. Officer Keith Falkner was engaged in the performance of his duty.

"4. This act occurred on or about the 22nd day of September, 2012, in Wyandotte County, Kansas."

K.S.A. 2015 Supp. 21-5904(a)(3) states that interference with law enforcement by obstruction occurs when a person "knowingly obstruct[s], resist[s] or oppos[es] any person authorized by law . . . in the discharge of any official duty." The corresponding PIK jury instruction for this type of interference with law enforcement includes the language that "[a]t the time the defendant knew or should have known that [*insert name*] was a law enforcement officer." PIK Crim. 4th 59.040.

35

*Analysis*

Essentially, an instruction that the jury was required to find that Chavez knew or should have known that Officer Falkner was a law enforcement officer to convict him of aggravated battery against a law enforcement officer is legally inappropriate.

The key in determining whether the instruction in question was error depends on what type of culpable mental state was necessary to commit an aggravated battery under K.S.A. 2015 Supp. 21-5413(d)(3)(A). The aggravated battery against a law enforcement officer statute states that defendants commit the crime when they "knowingly caus[e], with a motor vehicle, bodily harm" to a uniformed or properly identified law enforcement officer. K.S.A. 2015 Supp. 21-5413(d)(3)(A). K.S.A. 2015 Supp. 21-5202(b)(1)-(3) states that the culpable mental states in Kansas, from highest to lowest degrees, are intentionally, knowingly, and recklessly. Subsection (i) of K.S.A. 2015 Supp. 21-5202 states:

> "A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is *reasonably certain to cause the result*. All crimes defined in this code in which the mental culpability requirement is expressed as 'knowingly,' 'known,' or 'with knowledge' are *general intent crimes*." (Emphasis added.)

In regards to aggravated batteries against private citizens, which also requires that defendants "knowingly" commit the crime, our Supreme Court has cautioned that "the legislature [did] not intend for 'general intent' to necessarily mean what it once did and that 'knowingly' . . . means that the accused acted when he or she was aware that the his or her conduct was reasonably certain to cause the result." *State v. Hobbs*, 301 Kan. 203, 211, 340 P.3d 1179 (2015); see K.S.A. 2015 Supp. 21-5413(b)(1). Thus, courts should

36

focus on whether the evidence supports that defendants were reasonably certain that X action would lead to X result.

Consequently, defendants commit aggravated batteries against law enforcement officers under K.S.A. 2015 Supp. 21-5413(d)(3)(A) when they use a motor vehicle in a way that they realize is reasonably certain to result in bodily harm to a uniformed or properly identified law enforcement officer. Nevertheless, this court and our Supreme Court have held that this does not mean that defendants have to be reasonably certain that their actions will result in bodily harm to a law enforcement officer as opposed to a private citizen.

For instance, in *State v. Campbell*, 30 Kan. App. 2d 70, Syl. ¶¶ 2-3, 39 P.3d 97, *rev. denied* 273 Kan. 1037 (2002), this court held that a defendant could be convicted of battering a law enforcement officer so long as there was evidence establishing that the defendant knowingly took the action to harm another person; it did not matter that the defendant did not realize that this other person was a law enforcement officer. See also *State v. Fantroy*, No. 104,348, 2011 WL 3891874, at *4 (Kan. App. 2011) (unpublished opinion), *rev. denied* 294 Kan. 945 (2012); *State v. Thorton*, No. 103,748, 2011 WL 6942927, at *3 (Kan. App. 2011) (unpublished opinion) (both explaining that the *Campbell* holding requires proof of an intent to injure a person but not necessarily a police officer). Moreover, in *State v. Wood*, 235 Kan. 915, Syl. ¶ 8, 686 P.2d 128 (1984), which dealt with an earlier version of the statute with substantively identical language, our Supreme Court explained that to sustain a conviction of aggravated battery against a law enforcement officer the State does not have to "prove the defendant had actual knowledge that the person . . . battered was a law enforcement officer." The *Wood* court further held that this conclusion was necessary because the "officer-victim . . . need not personally identify himself [or herself] as a law enforcement officer to the defendant. The statute merely requires that the officer assaulted or battered be properly identified without designating the method." *Wood*, 235 Kan. 915, Syl. ¶ 9.

This conclusion is further supported by the notes to the PIK Crim. 4th 54.330 on aggravated battery of a law enforcement officer. Our Supreme Court has explained that "[t]he use of PIK instructions is not mandatory but is strongly recommended" partly because "[t]he pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions." *State v. Bernhardt*, 304 Kan. 460, 470, 372 P.3d 1161 (2016) (quoting *State v. Dixon*, 289 Kan. 46, Syl. ¶ 1, 209 P.3d 675 [2009]). One of the Notes for Use to PIK Crim. 4th 54.330 states: "If there is a question for the jury whether the victim was in uniform or properly identified and/or engaged in the performance of his or her duty the aggravated battery instruction, PIK [Crim.] 4th 54.310, should be considered as a lesser included offense." By making this note, the PIK committee clearly stated that the relevant issue in determining if an aggravated battery was committed against a law enforcement officer as opposed to a private citizen was whether the officer was in a uniform or otherwise properly identified while performing his or her duty, not whether the officer was recognized as an officer by the defendant.

Accordingly, Chavez' entire argument is based on a misinterpretation of the plain language of K.S.A. 2015 Supp. 21-5413(d)(3)(A). Kansas caselaw supports that the "knowingly" culpable mental state applies only to a defendant's decision to cause bodily harm to another person, not the decision to cause bodily harm to a law enforcement officer.

Moreover, it is also important to point out Chavez' reliance on K.S.A. 2015 Supp. 21-5904(a)(3) is inappropriate. First, interference with a law enforcement agent by obstructing that agent's discharge of an official duty under K.S.A. 2015 Supp. 21-5904(a)(3) is a crime affecting a government function, as opposed to aggravated battery against a law enforcement officer, which is a crime against that specific law enforcement officer. In other words, obstruction involves a crime against the government, while aggravated battery involves a crime against a person. Obviously, more serious

38

consequences can result from a law enforcement officer being battered than a law enforcement officer being obstructed. Second, unlike obstruction, a battery is a crime whether it was committed against a law enforcement officer or a private citizen. Thus, the identification issue is important with obstruction because the defendant could not be found guilty of a crime for obstructing a private citizen. As a result, there are reasons to treat the two crimes differently in regards to whether defendants must have knowledge that they are interacting with law enforcement officers.

Finally, even if Chavez had successfully argued that the trial court erred by failing to instruct the jury that an element of aggravated battery against a law enforcement officer required that he knew or should have known that Officer Falkner was a law enforcement officer, his argument would still fail because he cannot establish clear error. As previously stated, because Chavez failed to object below, even if the trial court erred, the error is not reversible unless this court determines that but for the error the jury verdict would have been different. See *Betancourt*, 299 Kan. at 135. Here, however, there was more than sufficient evidence to support that Chavez realized that Officer Falkner was a law enforcement officer.

Despite Chavez' trial testimony to the contrary, Captain Joyce, Officer Grimes, and Officer Falkner all testified that they were trying to apprehend a suspicious 6-foot tall Hispanic male wearing a plaid shirt for nearly 2 hours. They described the situation as a game of "cat and mouse," where they would get close to the suspect but then the suspect would see them and slip away. Captain Joyce, who testified that he was wearing a police uniform that night, explained that the suspect looked right at him before jumping off the porch of 918 Argentine Boulevard. Moreover, Officer Grimes testified that he saw the suspicious 6-foot tall Hispanic male in a plaid shirt running across nearby 10th Street before later seeing the same man walk across the porch of 918 Argentine Boulevard, take a red cooler, and then proceed to get into the black Ford Focus parked at the curb. Again, this was the same black Ford Focus that Captain Joyce believed belonged to the suspect.

39

This evidence, in and of itself, establishes that Chavez not only should have known but actually knew that he was being stopped by a law enforcement officer. Moreover, there can be no doubt that Chavez recognized that Officer Falkner was a law enforcement officer when one considers the preceding evidence in conjunction with (1) the fact that both Officer Grimes and Officer Falkner testified that Chavez looked at them when they were yelling at him to "stop" and "police"; and (2) the fact that Officer Falkner was wearing his uniform and badge when he opened Chavez' driver's side door, which was parked under a streetlight. Consequently, even if the trial court erred by failing to instruct the jury that Chavez had to know or should have known that Officer Falkner was a law enforcement officer, Chavez cannot establish clear error because outside of Chavez' own testimony, all the evidence supports that Chavez recognized that Officer Falkner was a law enforcement officer.

Affirmed.